FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
--------------------------------------------------------X

In Re:                                                                              Chapter 11

AMIEL RESTAURANT PARTNERS, LLC,                      Case No. 13-23866

                         Debtor.
--------------------------------------------------------X

**APPEARANCES:**

Timothy P. Neumann, Esq.
Broege, Neumann, Fischer & Shaver, LLC
25 Abe Voorhees Drive
Manasquan, New Jersey 08736
*Attorney for Amiel Restaurant Partners, LLC*

Lawrence J. Sharon, Esq.
Lebensfeld Sharon & Schwartz P.C.
140 Broad Street
Red Bank, New Jersey 07701
*Attorney for Morgan Realty & Development, LLC*

Bunce D. Atkinson, Esq.
Atkinson & DeBartolo
The Galleria, 2 Bridge Avenue
Building Two, Third Floor
Red Bank, New Jersey 07701
*Special Bankruptcy Counsel to Morgan Realty & Development, LLC*

Office of the United States Trustee
1 Newark Center
Raymond Boulevard & McCarter Highway
Suite 2100
Newark, New Jersey 07102

**MICHAEL B. KAPLAN, U.S.B.J.**

**MEMORANDUM DECISION**

**I.     INTRODUCTION**

This matter comes before Court on the motion of Morgan Realty & Development, LLC ("Morgan"), for an Order compelling Amiel Restaurant Partners, LLC ("Debtor") (i) to release to Morgan insurance proceeds of $358,800, escrowed with Debtor's bankruptcy attorney and derived from Debtor's personalty destroyed by Superstorm Sandy in Fall 2012 at the restaurant premises which the Debtor leases from Morgan; and (ii) to escrow an additional $724,475 for alleged prepetition defaults and construction costs to rebuild the restaurant.  For the reasons below, this decision addresses only the first question.  Thus, the issue for the Court is whether Morgan had an insurable interest in the Debtor's personalty to entitle Morgan to turnover of the insurance proceeds as an additional insured.[1]  The analysis is complicated because much of the case law on insurable interests involves disputes between a claimant and a carrier and not between competing claimants to the same insurance proceeds.

**II.     JURISDICTION**

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (E) and (O).  Venue is proper in this court under 28 U.S.C. § 1408.  The court issues the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

---

[1] As explained below, Morgan was endorsed on the policy in issue, the primary flood insurance policy issued by Fidelity National Indemnity Insurance Company, as additional insured and not as loss payee.

### III.    BACKGROUND

Morgan owns the Channel Club Marina, 33 West Street, Monmouth Beach, New Jersey. On October 20, 2010, Morgan and the Debtor entered into a commercial lease ("Lease") for the Debtor to lease from Channel Club Marina certain buildings which it operated as a restaurant and a snack bar for a 20-year term with the option for one 5-year renewal ("the Premises"). Rent for the first two years beginning December 1, 2010 was $12,000/month, rising to $13,333/month for years 3 through 5 with percentage increases at each 5-year interval for years 6 through 20; the Debtor also paid CAM charges and a percentage of profits. The Lease required the Debtor to maintain seven types of insurance coverage, including property insurance, and states, in relevant part, as follows:

> **10.    Insurance; Waivers, Subrogation; Indemnity**
>
> **(a)    Insurance**. Tenant shall maintain throughout the Term of this Lease the following insurance policies and coverage: . . . (ii) fire and extended coverage insurance insuring the Premises against loss or damage by flood, fire, lightning and wind storm, in the full amount of the current replacement value of the Premises, including any alterations therein or thereon; (iii) insurance covering the full value of Tenant's property and improvements, and other property (including property of others) in the Premises;
> . . . . All such policies shall include a waiver by the insurer(s) of the right of subrogation against Landlord, its agents, representatives, and affiliates. Tenant's insurance shall provide primary coverage to Landlord when any policy issued to Landlord provides duplicate or similar coverage, and in such circumstances Landlord's policy will be excess over Tenant's policy. Tenant shall furnish to Landlord certificates of such insurance and such other evidence satisfactory to Landlord of the maintenance of all insurance coverage required hereunder . . . .

(Docket No. 64, Exhibit 1, Lease). The policy prohibited Morgan and the Debtor from filing claims against each other and required the tenant to indemnify and hold the landlord harmless from "(i) any loss arising from any occurrence on the Premises; or (ii) Tenant's failure to

perform its obligations under this Lease." (Docket No. 64, Exhibit I, Lease, ¶¶ 10(b) and (c). The Lease sets forth the following duties of the Debtor and of Morgan if property damage occurred:

> **17.   Fire or Other Casualty.**
>
> **(a)   Repair Estimate**.  If the Premises are damaged by fire or other casualty (a "**Casualty**"), Tenant shall, within thirty (30) days after such Casualty, deliver to Landlord a good faith estimate (the "**Damage Notice**") of the costs and time needed to repair the damage caused by such Casualty.
>
> **(b)   Landlord's and Tenant's Rights**.  If a material portion of the Premises is damaged by a Casualty not caused by the negligent or intentional acts of Tenant or its employees, such that Tenant is prevented from conducting its business in the Premises in a manner reasonably comparable to that conducted immediately before such Casualty and Tenant estimates that the damage caused thereby cannot be repaired within one hundred eighty (180) days after the Casualty, then Tenant may terminate this Lease by delivering written notice to Landlord of its election to terminate within thirty (30) days after the Damage Notice has been delivered to Landlord. If tenant does not so timely terminate this Lease and provided the Casualty was not caused by the negligent or intentional acts of Tenant or its employees, then Rent for the portion of the Premises rendered untenantable by the damage shall be abated from the date of damage until the completion of the repairs.
>
> **(c)   Repair Obligation.**  If Tenant does not elect to terminate this Lease following a Casualty as provided in Section 17(b) above, then Tenant shall, as soon as practicable following the date of such Casualty, commence repairs to the Premises and shall proceed with reasonable diligence to restore the Premises (including any and all Alterations, furniture and equipment that existed therein prior to the Casualty) to the same condition as they existed immediately before such Casualty.

(Docket No. 64, Exhibit 1, Lease).  If Debtor defaulted in the payment of rent, paragraph 22 gave Morgan the right of distraint under N.J.S.A. § 2A:33-6 against Debtor's "goods and chattels" (as provided in the statute).  Paragraph 23, key to Morgan's claim that it has an insurable interest in

Debtor's personalty, defines the premises which the Debtor would ultimately surrender to Morgan:

> At the expiration or earlier termination of this Lease, Tenant shall deliver to Landlord the Premises: (i) with all Alterations, additions, improvements, fixtures, trade fixtures, furniture, equipment and other property utilized in connection with the operation of Tenant's restaurant, bars and Pool Snack Bar (which fixtures, trade fixtures, equipment and other such property shall become the sole property of Landlord at such time) in reasonable good repair and condition…

(Docket No. 64, Exhibit 1, Lease, ¶ 23).

In partial fulfillment of its insurance obligations, Debtor obtained:

> (1) a commercial property insurance policy with Lloyd's Underwriters for $1,000,000 building coverage and $300,000/$20,000 replacement cost personal property coverage (for the main building and snack bar) with Morgan named as *loss payee* (Docket No. 64, Exhibit 5);
>
> (2) a flood insurance policy through Fidelity National Indemnity Insurance Company ("Fidelity") for $500,000 building and $358,800 personal property coverage with Morgan named as *additional insured* (Docket No. 64, Exhibit 3); and
>
> (3) an excess building-only flood insurance policy with Lloyd's Underwriters for $481,174 (over the underlying limit of $500,000) with Morgan named as *additional insured* (Docket No. 64, Exhibit 4).

According to the declaration pages in these exhibits, these policies were effective January 13, 2012 to January 13, 2013. In its certification, Morgan describes itself as "loss payee with respect to each of the insurance claims submitted" even though, as recited above, two of the policies endorsed Morgan as additional insured and one as loss payee (Docket No. 64, George C. cert., ¶ 15).

Hurricane Sandy struck the premises on October 29, 2012. By written notice dated November 23, 2012, Debtor advised Morgan that Debtor would not terminate the Lease and

5

thereby triggered Debtor's obligation to repair the premises under Lease ¶ 17(c). On February 4, 2013, Morgan gave Debtor notice of termination of the Lease. Shortly afterward, Debtor sued Morgan and George Chrysthanopoulos in Superior Court of New Jersey, Chancery Division, General Equity Part (the "State Court Action"), for a declaration that the Lease was not terminated and for other relief, to which Morgan filed a counterclaim. On June 22, 2013, five of the six owners of the Debtor assigned their interests to Joseph Amiel who became the 100% owner of the Debtor. On June 24, 2013, the Debtor, through Mr. Amiel as Managing Member and 100% owner, filed a voluntary Chapter 11 petition in bankruptcy. Mr. Chrysthanopoulos certified that, about the time of the filing, the insurance claims were settled, and the following checks were issued or to be issued:

> (1)    check for $50,040 issued on the Lloyd's commercial property policy for windstorm damage;
>
> (2)    checks for $500,000 (building) and **$358,800 (contents)** issued on the Fidelity flood insurance policy; and
>
> (3)    $393,946 is to be issued on the Lloyd's excess flood insurance policy.

(Docket No. 64, George C. cert., ¶ 14) (emphasis added).

On July 10, 2013, the Debtor removed the State Court Action to the bankruptcy court. Morgan filed a motion for remand, stay relief and abstention on July 15, 2013. By Order entered on August 16, 2013, in partial resolution of the remand motion, the bankruptcy court ordered the Debtor to endorse the buildings proceeds checks ($450,000, $50,000, $50,040 and $393,946) to Morgan to repair the property without waving any claim by Debtor that these monies are estate property or that Debtor may be entitled to share in the proceeds. The Court also ordered Debtor to notify the Court on or before September 16, 2013 as to whether it intended to assume or to reject the Lease. On September 16, 2013, the Debtor filed a motion to assume the Lease. On

6

September 30, 2013, the Court remanded the State Court Action and granted limited stay relief to allow the Superior Court to determine if there were a prepetition default and termination of the Lease. The September 30, 2013 remand Order provides that the finding by State Court on lease termination will have an estoppel effect on the Debtor and on Mr. Amiel in bankruptcy court. The bankruptcy court reserved jurisdiction to determine whether any insurance proceeds were estate property and adjourned the Debtor's lease assumption motion to January 6, 2014.

Morgan filed the instant motion on March 31, 2014. The Court heard oral argument on May 1, 2014 and permitted additional briefing by both parties. The Court reserved decision on the issue of whether the $358,800 insurance proceeds for building contents from the Fidelity flood insurance policy on which Morgan was endorsed as additional insured are property of the bankruptcy estate, or constitute property of Morgan pursuant to the terms of the Lease. The Court stated on the record, on May 1, 2014, that it would defer deciding the second issue (Morgan's request for Debtor to pay $724,475 as adequate assurance for cure) until after deciding whether Morgan or the Debtor would receive the $358,800 proceeds.

## IV.    DISCUSSION

Property of the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case," subject to exceptions set forth in 11 U.S.C. § 541(b) and (c). 11 U.S.C. § 541(a)(1). Property interests are created and defined by state law unless federal law requires a different result. *Butner v. U.S.*, 440 U.S. 48, 55 (1979).

Bankruptcy courts distinguish between ownership of an insurance policy and ownership of the proceeds which it generates. *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993) ("[o]wnership of a life insurance policy such as involved here, does not necessarily entail ownership of the proceeds of that policy. Several different parties may have a property interest

in such a policy or its proceeds, including the owner, the insured, and the beneficiary, all of whom may be different persons"); *In re Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993) ("courts are generally in agreement that an insurance policy will be considered property of the estate . . . because, regardless of who the insured is, the debtor retains certain contract rights under the policy itself. . . . Acknowledging that the debtor owns the policy, however, does not end the inquiry.  'The question is not who owns the policies, but who owns the liability proceeds'") (*quoting In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1399, 1401 (5th Cir. 1987)) (finding that a directors' and officers' liability policy belonged to the bankruptcy estate but that the liability proceeds belonged to the directors and officers and were not estate property).  A primer on insurance in the landlord tenant context defines the parties in interest as follows:

> There are three key parties affected by an insurance policy:
>
> ● **Named insured.**  The named insured is the party that pays the premium for the property or liability policy.  The insurance company underwrites the policy and the premium based on the claims history and risk posed by the named insured. . . . It is not appropriate for a lease to require the landlord or the tenant to be a named insured or additional named insured on the other's policy.
>
> ● **Additional insured.**  An insurer can add either a landlord or tenant to the other's property or liability policy as an additional insured.  The added party can recover only if it has an insurable interest in the insured's property. . . .  [I]f a tenant in a turnkey space carries property insurance on its movable trade fixtures, the landlord will have very little, if any, insurance interest under the tenant's property insurance covering the trade fixtures.
>
> When a party is added as an additional insured, the negligent actions of the insured party will not defeat coverage of the additional insured under the policy.  The additional insured has the independent right regardless of the actions of the primary insured to a defense under the insured's policy, which can supplement the indirect indemnification provisions under the lease. . . .
>
> ● **Loss payee.**  An insurer can add either a landlord or tenant to the other's property or liability policy as a loss payee instead of as an

> additional insured. This gives the loss payee a mutual claim to the insurance proceeds. Just as an additional insured must have an insurable interest, so much as loss payee. Being a loss payee is not as desirable as being an additional insured, because the loss payee is subject to all defenses that the insurer may have against the primary insured. Further, a loss payee is entitled to the insurance proceeds only if the primary insured decides to pursue a claim.[2]

Ann Peldo Cargile, *The Basics of Insurance in Leases*, 14 A.B.A. Sec. Probate & Property 19 (Nov./Dec. 2000).

To recover from a property insurance policy, "the insured must have had an insurable interest in the property insured at the time of the [fire] loss." *Hyman v. Sun Ins. Co.*, 70 N.J. Super. 96, 99 (App. Div. 1961). It is not necessary to be "an absolute owner" of the property in order to have an insurable interest in it. *Id.* The Appellate Division in *Hyman* adopted the widely-stated formula for insurable interest:

> The test of insurable interest in property is whether insured has such a right, title or interest therein, [or] relation thereto, that he will be benefited by its preservation and continued existence or suffer direct pecuniary loss from its destruction or injury by the peril insured against.

*Hyman*, 70 N.J. Super at 100 (internal citations omitted in original). The court iterated, "[E]ven one who has no title, legal or equitable, in the property, and no present possession or right of possession thereof, yet has an insurable interest herein, if he will derive benefit from its continuing to exist, or will suffer loss by its destruction." *Id*. at 100. In *Hyman*, a real estate broker (who had purchased the insurance policy on the property) accepted, in lieu of payment at closing, the assignment without recourse of a $10,000 debt service payment payable from the

---

[2] *Accord Highway Trailer Co. v. Donna Motor Lines, Inc.,* 46 N.J. 442, 448, *cert. den.* 385 U.S. 834 (1966) ("ordinarily the rights of a loss payee are derivative and cannot exceed those of the insured. . . . But it is also true that a loss payee acquires independent "equitable rights, which the insurer is bound to regard'") (internal citations omitted); *Rena, Inc. v. TW. Brien*, 310 N.J. Super. 304, 317 (App. Div. 1998) ("[a] loss payee is not an insured but only 'a mere appointee [of the insured] who may not recover if the insured has breached any provision of the policy which would prevent recovery by him.' . . . If the loss is not payable to the insured, it is not payable to the loss payee") (internal citations omitted).

9

buyer to the seller who had taken a purchase money mortgage back from the buyer. *Id*. at 98. Although the broker did not record the assignment of the $10,000 payment until 9 days after the property was destroyed by fire, the Appellate Division held that the unrecorded assignment gave the broker an insurable interest in the proceeds of the fire policy protecting the property. *Id.* at 101. The court concluded that the broker "was entitled to be paid the amount of the policy." *Id*. at 101.

Claimants to insurance proceeds must have "an insurable interest at the time of the loss." *Shotmeyer v. N.J. Realty Title Ins. Co.*, 195 N.J. 72, 85 (2008) (under facts inapposite to those in this case, two brothers who transferred real property from their closely held general partnership to their closely held limited partnership without updating their title insurance policy did not have an "insurable interest" when a title defect was discovered because the policy had lapsed at the time of the transfer from one entity to the other, even though the brothers, as sole owners of the successive entities, were beneficial owners of the property throughout). Because the insurable interest does not depend on record ownership, determining whether the claimant has an insurable interest at the time of the loss requires factual as well as legal analysis. In *DeBellis Enter. v. Lumbermen's Mut. Cas. Co.*, 77 N.J. 428, 431 (1978), plaintiff DeBellis purchased from the Internal Revenue Service a tax sale certificate of seized property which gave the plaintiff immediate title to and interest in both real property and personalty formerly owned by the Teeds who were not a party to the action but who retained a 120-day right of redemption. Two months after DeBellis insured the property for $160,000 and paid the $1,413 premium, the property was destroyed by fire; and four days after the fire, the Teeds successfully redeemed the property for $5,264 ($5,000 for purchase price of certificate plus 20% interest). *Id.* at 431-32. Plaintiff DeBellis then sued the carrier for recovery against the insurance policy. Noting that N.J.S.A. §

10

17:36-5.19, which sets the terms of a fire policy, "does not specify when or how the interest of the insured is to be ascertained," the court in *DeBellis* opined that "the Legislature intended that coverage would depend upon the reasonable expectation of the insured. . . . [T]he *amount of recovery* may not necessarily be limited to the precise situation of the insured as of the date of the casualty and subsequent events may be significant in determining the insured's interest." *DeBellis*, 77 N.J. at 436 (internal citations omitted) (emphasis added). The court found that plaintiff DeBellis had not been made whole by the redemption and that allowing the carrier to pay nothing created a windfall for the carrier. *Id.* at 437-38. The New Jersey Supreme Court found that DeBellis's interest in the property "was equivalent to at least the amount expended for that interest some three months before the fire" plus 20% interest plus partial refund of the premium for the period after title reverted to the redeeming Teeds. *Id.* at 438.[3] *See also Miller v. N.J. Ins. Underwriting Ass'n*, 82 N.J. 594, 598-99 (1980) (holding that two claimants (separate cases) who had lost title to property through *in rem* tax foreclosure, which properties were destroyed by fire post-foreclosure, retained an insurable interest in the property under their insurance contracts. The claimants continued to occupy the properties ignorant of the tax foreclosures.)[4] The *Miller* court reiterated:

> With respect to real estate, an insurable interest need not rise to the level of legal or equitable title. In the past, New Jersey courts have recognized that an insured retains an insurable interest as long as he has a reasonable expectation of deriving pecuniary benefit from the preservation of the property or would suffer direct pecuniary

---

[3]And see reference in *DeBellis* to the Appellate Division opinion which stated that the buyer's interest was an "inchoate right" which ripened when the redemption period expired. *DeBellis*, 77 N.J. at 433 (the N.J. Supreme Court in *DeBellis* noted that the buyer's right "under the federal [tax sale] certificate was even more significant, for it included the additional attributes of a right to immediate possession of realty and to the prior owner's title in personal property.") *DeBellis*, 77 N.J. at 433.

[4]The second claimant obtained its insurance policy for the lost premises long after the redemption period expired. *Id.* at 597-98. The court appears to have found no defect in tax certificate purchasers' notice to the property owners, as *Tp. of Montville v. Block 69, Lot 10,* 74 N.J. 1, 20 (1977) (requiring mailed notice) applied only prospectively and not to the claimants in *Miller*.

11

> loss from its destruction. . . . Courts have differed in assessing the rights of an insured who has less than legal title at the time of a fire or who attempts to insure a possessory or expectancy interest less than complete title.

*Miller*, 82 N.J. at 600-601.  The court remanded to allow the claimants to prove the pecuniary value of their interest.  *Id.* at 602-603.  *See also The Columbia Ins. Co. v. Cooper*, 56 Pa. 331, 1865 WL 4620, *9 (1865) (where landlord owned a certain amount of machinery on the premises as well as having the right to seize the tenant's machinery in default of rent ("and it could not be severed from the freehold in [landlord's] prejudice"), the landlord had "an insurable interest in all the machinery" and committed no fraud by failing to disclose the tenant's interest); *Mutual Fire Ins. Co. of Loudoun Cty. v. Ward*, 95 Va. 231, 28 S.E. 209, 214 (1897) (landlord had an insurable interest in the contents of tenant's residence under the tenant's insurance policy, where statute gave the landlord the right "to hold the good upon the premises for the payment of the rent").  *Compare Balentine v. N.J. Ins. Underwriting Ass'n*, 406 N.J. Super. 137, 139-40 (App. Div. 2009), in which the property owner of record (who was named insured) granted power of attorney to a friend who occupied and managed a real property, but the insurer after an act of vandalism refused to pay insurance proceeds to either the record owner or the friend.  Both the trial court and the Appellate Division found that the record owner had an insurable interest in the property and was entitled to the proceeds:

> [The carrier] misread the significance of *Hyman* and *Miller*.  Both cases illustrate that there are times when a person who *lacks* recorded ownership or title in property may, nevertheless, have an insurable interest in those premises because of other nexus factors.  Neither case states that a person *with* such title of record can be deemed outside of the zone of an insurable interest.

*Balentine*, 406 N.J. Super. at 143 (emphases in original).  *And compare Citigroup, Inc. v. Industrial Risk Insurers*, 336 F. Supp. 2d 282, 289 (S.D.N.Y. 2004), *aff'd*, 421 F.3d 81, 83

(2005) (landlord had no insurable interest in tenant's chattels under landlord's *own* policy where chattels would become landlord's property only if tenant abandoned or intentionally conveyed them). By contrast, in the instant case, Morgan's right under Lease paragraph 23 to recover the Premises with its contents at the termination of the Lease affords Morgan "a reasonable expectation of deriving pecuniary benefit from the preservation of the property" and therefore an insurable interest in property for which it had been endorsed on the Fidelity flood insurance policy as an additional insured.

The Debtor, in its supplemental brief dated and filed on May 12, 2014, cited at length *Arthur Andersen LLP v. Fed. Ins. Co.*, 416 N.J. Super. 334, 349-50 (App. Div. 2010) ("Andersen") for the New Jersey common law doctrine of "insurable interest" already set forth above; however, the Appellate Division in *Arthur Andersen* upheld the trial court's ruling against the plaintiff accounting firm which sought to recover on a $204 million business interruption claim against its carriers following the September 11, 2001 attacks on the World Trade Center ("WTC"), finding that Andersen did not have an insurable interest in the WTC property:

> The common thread in cases in which an insurable interest if found is the existence of a cognizable relationship between the insured and the property that provides the basis for the insured to derive a direct pecuniary benefit from the property or suffer a direct pecuniary loss if the property is damaged. . . .
>
> The evidence here fails to show that Andersen derived any income, such as rent, from the existence of the WTC or that Andersen bore any potential liability to others based upon its "interest" in the WTC. In short, there are no circumstances of Andersen's association with the WTC that gave rise to the threat of a *direct* pecuniary loss to Andersen in the event the WTC was damaged.
>
> Andersen's theory would permit an insured to allege an insurable interest in a class of property so broad as to be impossible to define and certainly not susceptible to a predictable level of risk.

*Arthur Andersen*, 416 N.J. Super. at 351, 353 (emphasis in original).

The facts in *Arthur Andersen* are distinguishable from those in the instant case in which landlord Morgan anticipated deriving a "direct pecuniary benefit" under paragraph 23 of the Lease which was for a finite term (with one option for a short renewal) and which required the Debtor to turn over to Morgan at the termination of the Lease the Premises "with all Alterations, additions, improvements, fixtures, trade fixtures, furniture, equipment and other property utilized in connection with the operation of Tenant's restaurant, bars and Pool Snack Bar (which fixtures, trade fixtures, equipment and other such property shall become the sole property of Landlord at such time) in reasonable good repair and condition." (Docket No. 64, Exhibit 1, Lease, ¶ 23). *In re Gibson*, 218 B.R. 900, 903 (Bankr. E.D. Ark. 1997), also relied on by Debtor, an out-of-circuit case relying almost entirely on out-of-circuit law for the proposition that both the insurance policy and the insurance proceeds are property of the estate, is at odds with *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3d Cir. 1993), which distinguishes between ownership of the policy and ownership of the proceeds.  In *Gibson*, the court found that the interest of a motor vehicle insurer, as loss payee, in a motor vehicle destroyed post-confirmation was *limited* to and *res judicata* under the 11 U.S.C. § 506(a) value in the confirmed plan such that the debtor was entitled to use the surplus proceeds to repair another vehicle.  The court in *Gibson* did not conclude that deeming the proceeds estate property cut off the carrier's insurable interest in the motor vehicle.  *In re Gibson*, 218 B.R. at 903-904.  The Debtor also cited *SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Props., LLC*, 445 F. Supp. 2d 320, 331 (S.D.N.Y 2006) where there was no dispute that a claimant had an "insurable interest" in property but the parties disputed the mechanism for valuing the interest.

## V. CONCLUSION

The October 20, 2010 Lease between Morgan Realty & Development, LLC, and Debtor Amiel Restaurant Partners, LLC, mandated that, "at the expiration or earlier termination" of the Lease the Debtor would deliver the premises to Morgan "with all Alterations, additions, improvements, fixtures, trade fixtures, furniture, equipment and other property" which the Debtor used in its operations and which would become the "sole property" of the landlord, irrespective of any default by the Debtor and independent of any action or election by the Debtor (Docket No. 64, Exhibit 1, ¶ 23). Morgan, endorsed as an additional insured on the Fidelity flood insurance policy, has an insurable interest, as recognized in *Miller v. N.J. Ins. Underwriting Ass'n*, 82 N.J. 594, 600-601 (1980) and in *Human v. Sun. Ins. Co.*, 70 N.J. Super. 96, 100 (App. Div. 1961), in the property which the Debtor used in its operations. Under the property rights created in Morgan by the Lease, the proceeds of the Fidelity flood insurance property are not property of the estate, and Morgan is entitled to payment of those proceeds which issued in the amount of $358,800. Counsel for Morgan is directed to submit a proposed form of order consistent with the Court's decision.

Dated: June 16, 2014

Honorable Michael B. Kaplan
United States Bankruptcy Judge